CA 06-271 T



# MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

| | |
|---|---|
| United States District Court | District RHODE ISLAND |
| Name (under which you were convicted): FRANK E CORRENTE | Docket or Case No.: 1 00 CR 00083 02 T |
| Place of Confinement: FEDERAL MEDICAL CENTER DEVENS | Prisoner No.: 04896 070 |
| UNITED STATES OF AMERICA v. | Movant (include name under which you were convicted) FRANK E CORRENTE |

## MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: U S DISTRICT COURT FOR DISTRICT OF RHODE ISLAND PROVIDENCE R I

   (b) Criminal docket or case number (if you know): 1 00 CR 00083 02 T

2. (a) Date of the judgment of conviction (if you know): SEPTEMBER 25 2002 AMENDED JUDGMENT JUNE 15 2005

   (b) Date of sentencing: SEPTEMBER 25 2002,AMENDED SENTENCE JUNE 15 2005

3. Length of sentence: ORIGINAL 63 MONTHS AMENDED 56 MONTHS

4. Nature of crime (all counts): 18 USC 1962 D RICO CONSPIRACY,18 USC 1962 C 2 RICO 18 USC 371,666 A 1 B CONSPIRACY TO COMMIT BRIBERY,18 USC 1951 A 2 ATTEMPTED EXTORTION,18 USC 1951 A CONSPIRACY TO COMMIT EXTORTION

5. (a) What was your plea? (Check one)

   (1) Not guilty ☒ (2) Guilty ☐ (3) Nolo contendere (no contest) ☐

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

6. If you went to trial, what kind of trial did you have? (Check one) Jury ☒ Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing? Yes ☐ No ☒

8. Did you appeal from the judgment of conviction? Yes ☒ No ☐

9. If you did appeal, answer the following:

(a) Name of court: UNITED STATES CIRCUIT COURT FOR THE FIRST CIRCUIT

(b) Docket or case number (if you know): –

(c) Result: AFFIRMED IN PART AND REMANDED FOR RE SENTENCE

(d) Date of result (if you know): 6-15-05

(e) Citation to the case (if you know): 278 F 3RD 71

(f) Grounds raised: 1. Sufficiency of evidence for the Hobbs Act conviction.
2. Validity of RICO offense using public entity as a participant.
3. Erroneous jury instructions.
4. Whether the requirements for a federal bribery offense had been satisfied.
5. Denial of confrontation rights, various sentencing issues.
6. Denial of due process.

(g) Did you file a petition for certiorari in the United States Supreme Court? Yes ☐ No ☒

If "Yes," answer the following:

(1) Docket or case number (if you know): __________

(2) Result: __________

(3) Date of result (if you know): __________

(4) Citation to the case (if you know): __________

(5) Grounds raised: __________

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ☐ No ☒

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: __________

(2) Docket or case number (if you know): __________

(3) Date of filing (if you know): __________

(4) Nature of the proceeding: N/A

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application? Yes ☐ No ☐

(7) Result: N/A

(8) Date of result (if you know): N/A

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: N/A

(2) Docket or case number (if you know):

(3) Date of filing (if you know):

(4) Nature of the proceeding:

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application? Yes ☐ No ☐ N/A

(7) Result:

(8) Date of result (if you know):

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition: Yes ☐ No ☐

(2) Second petition: Yes ☐ No ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not: **N/A**

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

GROUND ONE: **INEFFECTIVE ASSISTANCE OF COUNSEL.**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
**(See Enclosed Addendum I)**
**Page - #15-18.**

(b) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☒

(2) If you did not raise this issue in your direct appeal, explain why: **§2255 Petition, Appropriate forum to raise this issue.**

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☒

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: ____________

Name and location of the court where the motion or petition was filed: ____________

Docket or case number (if you know): ____________________

Date of the court's decision: ____________________

Result (attach a copy of the court's opinion or order, if available): ____________________

____________________

____________________

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ____________________

____________________

Docket or case number (if you know): ____________________

Date of the court's decision: ____________________

Result (attach a copy of the court's opinion or order, if available): ____________________

____________________

____________________

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: ____________________

____________________

____________________

____________________

____________________

GROUND TWO: **PROSECTORIAL MISCONDUCT.**

____________________

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

**(See Enclosed Addendum II)**

**Pages. #19 — 21**

____________________

____________________

____________________

____________________

____________________

____________________

(b) Direct Appeal of Ground Two:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☒

(2) If you did not raise this issue in your direct appeal, explain why: §2255 Petition, Appropriate forum to raise this issue.

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: __________

Name and location of the court where the motion or petition was filed: __________

Docket or case number (if you know): __________

Date of the court's decision: __________

Result (attach a copy of the court's opinion or order, if available): __________

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: __________

Docket or case number (if you know): __________

Date of the court's decision: __________

Result (attach a copy of the court's opinion or order, if available): __________

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: ______

GROUND THREE: **ENTRAPMENT/POLICE MISCONDUCT/ABUSE OF DISCRETION.**

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):
**(See Enclosed Addendum III)**
**Pages #22-29**

(b) Direct Appeal of Ground Three:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☒

(2) If you did not raise this issue in your direct appeal, explain why: **Counsel's Ineffective Investigation, Newly discovered facts §2255 Petition appropriate forum to raise this issue.**

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐ **(Unknown)**

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: ______

Name and location of the court where the motion or petition was filed: ______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: ______

GROUND FOUR: DENIAL OF CONSTITUTIONAL RIGHT OF DUE PROCESS.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(See Enclosed Addendum IV.)

Pages #30-32

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☒ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: Newly discovered facts. §2255 Petition appropriate forum to raise this issue.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐ **(Unknown)**

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: ______

Name and location of the court where the motion or petition was filed: ______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: ______

Docket or case number (if you know): ______

Date of the court's decision: ______

Result (attach a copy of the court's opinion or order, if available): ______

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: ______

13. Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: ______

14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the judgment you are challenging? Yes ☐ No ☒
If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. ______

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:
(a) At preliminary hearing: ______
(b) At arraignment and plea: ______
(c) At trial: C. LEONARD O BRIEN ESQ
129 DYER STREET
(d) At sentencing: PROVIDENCE RHODE ISLAND 02903
ALL TRIAL LEVEL PROCEEDINGS PRIOR TO APPEAL

(e) On appeal: ANTHONY M TRAINI ESQ
50 PINE STREET PROVIDENCE RHODE ISLAND 02903

(f) In any post-conviction proceeding: ______________________

(g) On appeal from any ruling against you in a post-conviction proceeding: ______________________

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time? Yes ☒ No ❑

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? Yes ❑ No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: ______________________

(b) Give the date the other sentence was imposed: ______________________

(c) Give the length of the other sentence: ______________________

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future? Yes ❑ No ❑

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.* NOT NOT APPLICABLE

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore, movant asks that the Court grant the following relief: **VACATE THE CONVICTION AND THE ENSUING SENTENCE IN VIEW OF INEFFECTIVE ASSISTANCE OF COUNSEL AND THE VARIOUS VIOLATIONS OF MY CONSTITUTIONAL RIGHTS TO DUE PROCESS AND FAIR TRIAL**

or any other relief to which movant may be entitled. ***** SEE ATTACHED REQUEST FOR ADDITIONAL RELIEF *****

____________________________

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on 6th June, 2006 (month, date, year).

Executed (signed) on June 5, 2006 (date).

Frank E. Corrente

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion. ____________________________

IN FORMA PAUPERIS DECLARATION

____________________________

[Insert appropriate court]

* * * * *

***** REQUEST FOR ADDITIONAL RELIEF ON BEHALF OF 28 USC §2255 FILED BY FRANK E. CORRENTE *****

A. 28 USC §2255 provides for the Court to grant a prompt hearing and the Petitioner Frank E. Corrente respectfully requests that an evidentiary hearing be conducted to investigate the factual basis for the claims of ineffective assistance of counsel.

B. In addition, Petitioner requests that the Court issue a Certificate of Appealability for the reason that the issues set forth in the above recited Habeas Petition are debatable among jurists of reason.

C. The Petitioner brings to the attention of the Court the case of **Washington v. Recuenco**, 126 S. Ct. 478 (2005) where the Supreme Court has granted certiorari and the issues to be decided in that case have significant impact upon the Petitioner's habeas petition. The Petitioner asks that the Court consider awaiting disposition of this habeas petition until such time as the Supreme Court decides **Washington v. Recuenco**. It is anticipated that such decision will be forthcoming from the Supreme Court within 30 days of the filing of this Petition under 28 USC §2255.

DATED: JUNE 5th, 2006

RESPECTFULLY SUBMITTED,

Frank E. Corrente

FRANK E. CORRENTE, Petitioner

## TABLE OF CONTENTS


| | |
|---|---|
| Motion under 28 U.S.C. §2255 | Pages 2-14 |
| Addendum I.<br>INEFFECTIVE ASSISTANCE OF COUNSEL | Pages 15-18 |
| Addendum II.<br>PROSECUTORIAL MISCONDUCT | Pages 19-21 |
| Addendum III.<br>ENTRAPMENT/POLICE MISCONDUCT<br>ABUSE OF DISCRETION | Pages 22-29 |
| Addendum IV.<br>DENIAL OF CONSTITUTIONAL RIGHT<br>OF DUE PROCESS | Pages 30-32 |
| EXHIBIT I. | Page 33 |
| EXHIBIT II. | Page 34 |
| EXHIBIT II.(A) | Pages 35-36 |
| EXHIBIT II.(B) | Page 37 |
| EXHIBIT II.(C) | Pages 38-39 |
| EXHIBIT II.(D) | Page 40 |
| EXHIBIT II.(E) | Pages 41-42 |
| EXHIBIT II.(F) | Page 43 |
| EXHIBIT II.(G) | Page 43.5 |


### STATEMENTS


| | |
|---|---|
| Exhibit III<br>DECLARATION OF PHILIP D. PESTRICHELLO | Page 44 |
| EXHIBIT IV.<br>DECLARATION OF VINCENT DIGUILIO | Page 45 |
| EXHIBIT V.<br>DECLARATION OF DAVID G. STERN | Pages 46-47 |
| EXHIBIT VI.<br>NON-SEQUITUR | Pages 48-49 |


**FRANK E. CORRENTE, 04896-070**
**Federal Medical Center, Devens Camp**
**P.O.Box 879**
**Ayer MA. 01432-0879**

GROUND #1

**ADDENDUM I.**

**INEFFECTIVE ASSISTANCE OF COUNSEL**

The failure of Counsel to subject the Prosecution's case to meaningful adversarial testing is fatal to the skills of a reasonable, objective practitioner of the craft. But for Counsel's deficiencies in performance, and omissions, the results of the proceeding would have been different. The consequences are/were a direct failure of Counsel to recognize the consequences related to their (his) inadequate investigation, political circumstances/environment and the failure to be mindful of peripheral routes of persuasion.

**COUNSEL FAILED TO EXERCISE "ORDINARY DILIGENCE."**

**A.**

If Counsel had been diligent in their investigation the Jury and the Court would have learned that the focal point of the Freitas and F.B.I subterfuge, "the lease," was awarded eight to nine months prior to Freitas debut appearance in my office, (Exhibit I). No reasonable person would be able to find the facts to substantiate "probable cause." In simple terms Freitas, and the F.B.I. rolled over the Fourth Amendment, whereby "[n]o warrants shall issue, but on probable cause,..." The issue of "probable cause," should have been found, but Counsel merely "rolled-over," Failing to investigate allowed the Government to proffer blatant factual inaccuracies that influenced the Court and Jury. Denying me effective assistance of Counsel.

B.

The comment by the Appellate Court Judge "these (Pannone) tapes are very damaging", with the Government agreeing and Counsel's failure to review the correctness, intensity and coherence of the "Pannone" tapes in a timely manner curbed my rights instead of challenging the excesses of the Prosecution.

C.

The failure of Counsel to subpoena Mr. Pannone, a key prosecution witness, who made coerced statements to obtain a favorable plea, and to curry favor profoundly undermined the heuristic of credibility or the proceeding. Counsel failed to act on my right to compulsory process, in that Counsel refused to seek the Trial Court to call witnesses in my favor a conduct that was arbitrary, since the witness in question is and was material to my defense. Instead is was alleged during my Appellate oral argument in which Judge Stahal said "you could have called him (Pannone), was it a strategy on your part at that point not to call him," Counsel responded, "Absolutely not, he was thoroughly and totally unavailable." Mr. Pannone, the absent witness, was particularly within the government's and defense counsel's power to produce, as he was and had been incarcerated at the Federal Medical Center, Devens, in Ayer Massachusetts. For an individual key witness for the Prosecution and defense Counsel, who was known to be incarcerated, and yet "Absolutely Unavailable," actually and shamefully subverts the process of justice. Counsel disregarded my right to compulsory process to secure the attendance of Mr. Pannone. Not only was my right as a Defendant usurped but the right of the Trial Judge to make an appropriate inquiry into the good-faith bases for Mr. Pannone's contention that he was "Absolutely Unavailable," was disregarded.

D.

Instead, alleged unique vocal sounds on an unsecure, alterable sound recording were proffered as credible evidence of past recollection, recorded from Mr. Pannone, the alleged **res gestae** witness. Counsel further illustrated it's ineffectiveness by failing to move the Trial Court for a "missing witness" jury instruction, which further prejudiced the Defendant. Omitted issues were clearly persuasive, and attributable to Counsel's errors of Constitutional magnitude. No one can forfeit another's rights, yet that is what has occurred.

****

The weakness in Counsel's performance and the "Prince of Justice's" desire for a conviction fueled by the "fourth estate," disregarded justice and prejudiced the Defendant. The United States Constitution guarantee's were tossed aside much like an extended warranty option on an "Edsel."
I was not only denied the right to confront my accuser, the right to compulsory process, I was also denied the right to introduce evidence as to the truthfulness of the Prosecution's assumptions. Contrary to my numerous demands of Counsel. Counsel **failed** to subject the Prosecution's case to the "light-of-day," upsetting the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. Succeeding generations should not be subjected to the progeny of "Prosecutions-By-Any-Means."

In matters of consequence, I was denied the opportunity to present critical relevant evidence of Mr. Pannone's chronic disability of mental and social function. Mr. Pannone has a history of frequent delusional episodes, a condition far more serious than "political puffery." The Prosecution had full knowledge of Mr. Pannone's questionable creditability, and psychopathology.

Knowledge is an essential pre-requisite to performance. The Court and the Jury were denied direct revelation of Mr. Pannone's condition, history and grandiosity. Exculpatory evidence that was well known to the Prosecution, but was never exposed to the 'light-of-truth,' of the Court and Jury.

Under the circumstances, the ineffectiveness of counsel foredoomed the pursuit of fairness, turning instead to tragedy and futulity. Legal Counsel's "serious errors," and Trial Counsel's failure to conduct an adequate investigation, struck a mortal blow to my Fourth and Sixth Amendment rights. Even if this miscarriage of justice were permitted, Defence Counsel's acts and omissions allowed the Court to consider **false** and **unreliable** information in imposing sentence, and there is a reasonable probability that, but for Counsel's errors the Court would have imposed a more favorable sentence. The Defendant continues to suffer the consequences of the ineffective assistance of Counsel.

I was "fast-forwarded,' along a tissue of **lies, half-truths, political gamesmanship** and sixty second sound-bites, with the Prosecution, in an unreasonable application of clearly established Federal Law, shamelessly put together and promoted for their own gain "a win-at-all-costs," exploiting not only me and my family, but the Court, and the good people of the State of Rhóde Island, especially the people of Providence.

**ADDENDUM II. PROSECUTORIAL MISCONDUCT GROUND II**

The truth has never walked into the Courtroom. What comes before the bench is the recollections, and rumination of human fallible memory, "brought" into existence through acts of perception and only exist insofar as we perceive them.

The "Prince of Justice," the Prosecutor, represents the people of the United States, and is "[b]urdened both with obligation to zealously represent the Government and, as the representatives of Government dedicated to fairness and equal justice to all, with an over-riding obligation of fairness to the defendant." The obligation of fairness to the defendant includes a duty to refrain from improper methods calculated to produce wrongful convictions. Herein lies the triskelion meteral facts of Prosecutorial Misconduct in this case. It is the intent to triumph over the sense of fairness at the expense of the defendant and the people that I bring to the attention of this Court. Justice was denied and political capital gained by the Prosecution.

Conduct agreed upon and sanctioned between the United States Attorney and the Prosecuting Assistant United States Attorney via a conspiratorial formula for the sole purpose of obtaining a "win," a conviction, and publicity in the high profile case regardless of the assault on their Oath of Office or the Court. The Prosecutor's material bad acts polluted and inflamed the Jury's perception of reality. Engaging in tactics of propoganda suited for their purpose. At no time did the Prosecutor or the United States Attorney, herself, through word, instruction or action correct the material falsehoods.

**COUNT II(a)**

The Prosecution's case was knowingly rooted in perjured, coerced testimony. The key witness, Mr. pannone's testimony was known or should have been known by the Government to be the gross caricature of coerced perjury. The fact that Mr. Pannone's testimony was coerced and false is evidenced by the Prosecution's revocation of the "deal" of immunity granted Mr. Pannone for his testimony.

Knowledge is an essential pre-requisite to performance. Knowledge of the 'holes' in Mr. Pannone's story-book rendition is the Prosecution's admittance that the revocation of Mr. Pannone's "deal" is a direct consequence of the unreliability of his testimony, and the frequent coaching of him by agents, or assigns of the Government. It is unlikely that the Assistant United States Attorney would have recinded Mr. Pannone's "deal" without first discussing the issue with the United States Attorney.

A conviction obtained through the use of false evidence, known to be such by a representative of the Government is inverse of the 14th. Amendment. And the Prosecutor's knowing presentation of testimony by a cooperating witness deny the existence of any "deal" regarding his own charges as well requires reversal of the Accused conviction.

**COUNT II(b)**

Prosecutorial complicity in offering evidence to the Court to obtain a ruling on its admissibility with knowledge of the nonexistence of a preliminary fact. Coupled with an intent to achieve the Prosecution's objective is a combination of conduct for the unlawful purpose of obtaining a conviction, a "win" on false, perjured testimony.

COUNT II(c)

The prosecutor did utter, from his own mouth, and admit to the removal of what the media labeled the "infamous Corrente-Fretias video," for the knowingly bias contemptable purpose of the Court ordered sealed evidence, to persons other than the Prosecution team. If a "Little" arsenic will make one ill, how "harmless is a Little viewing" of pre-trial sealed evidence to the eyes, ears and immaginations of the defendant. That obligation includes the duty to refrain from improper methods calculated to produce a wrongful conviction.

Prosecutorial misconduct, was recognized by the Court in its minimal sanctions against the Prosecutor, with the Court's expectation that the full weight of the United States Attorney's Office would come to ethically demand further disciplinary action. The United States Attorney's part in the gross misconduct is evident by the fact that NO disciplinary action of any kind was taken against the Prosecutor. The message sent to the public and the Jury - "anything goes," when it comes to Prosecutorial conduct, including subverting the right of due process.

In this instance the Prosecutor reaped the fruits of the United States Attorney's permissiveness, and attitude of "win-at-all-costs." No one after all prospers by winning medals in losing causes. Judge Learned Hand once commented that, "Conspiracy is the brightest flower in the U.S. Attorney's nursery." It would seem that the United States Attorney for Rhode Island was seduced and succumbed to the "brightest flower," in her own nursery fertilized in the media strategy.

**GROUND III**

**ADDENDUM III**

**ENTRAPMENT/POLICE MISCONDUCT/ABUSE OF DISCRETION**

The government failed to exercise due diligence and observe its own laws. The Government's conduct in the instant case was characterized by its loss of conduct with reality, deterioration in the level of functioning, and disintegration of individuality. Intoxicated with power, law enforcement binged on deliberate ignorance and utilized malignant animosity as a laser-targeting device even though there was **NO** fair probability or substantial chance of criminal activity as required under USCA Constitutional Amendment Four (4).

**A.**

The fiction of probable cause put forth and prosecuted by the Government alleged that Mr. Freitas was "paying" monies to have a lease awarded in his favor. The F.B.I. sting was set, public funds expended, and non-judicial sanctioned wiretapping were all in place. The only thing missing was that the F.B.I. failed to fully investigate the facts, thereby intentionally declining to discover the validity or absence thereof of the facts, i.e., "deliberate ignorance". The lease in question was awarded by the School Board **eight to nine months PRIOR to the onset of their sting**, (Ex. 1). It is obvious that the F.B.I. believes that because they are "law enforcement" that they can take a bite of the apple eight to nine months AFTER it is gone!

What is also obvious is that the F.B.I.'s misconduct and continued "political falsehoods" deprived me of procedural safeguards recognized both by law and the USCA Constitutional Amendment 14. All of this done for scripting and to portray me and my service to the City of Providence as Mephistophelan.

B.

Reason without action and action without reason is blind. Investigator's predisposition to take action tied to one-dimentional and over-specialized bias reason has brought about unprecedented alienation and devastation to my civil rights. The F.B.I's monolithic reliance on the ineffable Mr. Anthony Freitas was scripted, much like a day-time soap-opera, with me as the villan. Mr. Freitas came to law enforcement's attention only after he threatened revenge against Mayor, his staff, and the School Board. The F.B.I., United States Attorney and my Counsel failed to recognize the scripted descriptive and the normative, between the objective and the subjective. Federal Agents played a debased role when they became the instigators and partners in what the media, and lynch mob mentality determined was my guilt within the labyrinth portrayed by the Government's scam. In my case the F.B.I. was the creative brain behind an illegal scam, chosing to reinterpret, manipulate, finesse harmless political puffery to a constituent for their own conspiratorial gain.

The F.B.I. had a pre-determined, pre-meditated goal, and any evidence contrary to that goal was of no consequence. Therefore, there was no way to determine whether political pressure was exerted, or, for that matter offered on Freitas behalf. There are four telling aspects of the F.B.I.'s investigative bias. They serve as vectors, in that all move toward the F.B.I.'s usual and customary goal of "indictment." And what is the percentage of the F.B.I. investigations that do not end in an indictment? Although there are others the vectors include:

I.

It is impermissible for law enforcement or their "actor" (Anthony Freitas) to pressure me by using overbearing conduct such as badgering, cajoling, importuning, or other affirmative acts likely to induce a normally law-abiding person to commit an offense that was planned by, funded by, and directed by law enforcement. The FBI strategy and that of the U.S. Attorney was to create nothing short of a political "Coup de Grace" within the city of Providence, Rhode Island. The FBI coached Mr. Freitas as to what words to use, and what actions were required in order to achieve a predetermined result. They even provided Mr. Freitas with taxpayer money in order to fund the government's scheme. The trial transcript confirms that Freitas did exclusively what the FBI directed him to say and do. It also documents that, left to his own devices, he would never have spent/used one dollar of his own money to this end.

Not once was it ever raised by either advocate a reason as to what or why this money was even accepted. Omitted was the simple fact that Freitas had on other occasions donated funds to the Mayor's political reelection campaigns. Only after repeatedly informing Mr. Freitas that there was nothing that I could do for him relative to his obsession with the lease, and only at his insistence, did he force the envelopes upon me with my understanding that their contents were to be used solely for the Mayor's reelection.

We use language to label events. The FBI sought to twist, finesse, and pervert what would otherwise have been a harmless and legal accepted political puffery. Instead, the FBI disguised and paraded an artificial interpretation meant to fit their distorted purpose.

II.

It would hardly be an exaggeration to say that the Government sought to obfuscate the facts that **JKL Engineering, (Anthony Freitas/Actor)** was unequivocally denied in writing his sought after lease commitment on January 23, 1998, by School Board Attorney, Joseph A. Rotello, (Exhibit II). That is in excess of one year prior to the "Actor's" staged and debuted histrionics. Yet the F.B.I., the self-identified moral police, continued to provide the stage, props, and homilies for their orchestration in furtherance of their scheme and need for organized power. Furthermore, Mr. Freitas appeared at my office on two separate occasions at the behest of the "Directors," because a previously recorded scene proved that **I would not** accept monies in an effort to secure his lease, (see, Exhibit IIb).

Freitas was informed at a School Board meeting that he was **NOT the lowest bidder,** and that the "plot-plan" of his property was not consistent with the School Board's needs. He was informed of this **year plus prior** to his staged anticipatory anxiety in his "staring role." Mr. Freitas was repeatedly told **NO** official influence could be bought. In his final "scene" he lay-in-wait for me to return to my office, stalking me and following me into my office without invitation or permission for the myopic purpose of the "Directors." He took advantage and opportunity when I was distracted. At no time was Mr. Freitas told anything but standard political rhetoric.

**B.**

The Government and Law Enforcement deliberately doctored the record of their own investigation to support a false position.

My telephone conversation with Mark Dunham (Director of Business Relations For The School Department) did not pertain to Freitas's lease, I questioned why property was being considered outside the city of Providence. My concern was why are monies allocated to the Providence School Board going to (Cranston) another township? This had nothing to do with the Freitas lease which was denied long before that time, and awarded well over a year prior. In reality no lease was ever consummated. Johnson & Wales University donated, free of charge, the required space to the Providence School Board. (see Exhibit G).

The Government failed to offer any evidence that I would accept on "ordinary opportunity" to take a bribe. Furthermore, there is no evidence that I had the mental state of being willing to swallow the Government's bait, as evidenced by my eviction of Freitas from my office the previous times he presented unprincipled suggestions. I did not have the requisite degree of control over the School Board's core functions. The Government and my counsel did not establish that my duties-be-it by official duty, or a position of some de-facto control that I had any control over the School Board's affairs.

III.

On the issue of obtaining Mr. Freitas a "check" for a previous invoice. The City of Providence was routinely late in payment of their obligations. I did a constituent a favor and intervened so that he would receive his payment in a timely manner at the request of Mr. Pannone. Freitas, had already testified that he would not have used any of his own funds for the F.B.I. and at NO time was any monies sought, required, requested, paid or anticipated for performing this public service. The F.B.I. handling Freitas directed him

to invite Mr. Pannone to his office, and set-up the scene so that the money (supplied by the F.B.I.) could be alleged to go to me, when in actuality it was "pocketed" by Pannone. Freitas consistently directed that Pannone should take the money to me. Which as the Court should know (based on Pannone's case and conviction), never occurred. Pannone's statements that he was going to my office was merely the "blustering" of an old man who was trying to inflate his own ego, self worth and importance.

C.

Pannone was not aware that Freitas was going to offer to foist money on him for obtaining the past due amount ($1100.00). He had no inkling until he arrived at Freitas' office what was being offered. If a conspiracy "[i]s an agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective." Pray tell, how can I be found guilty of a conspiracy without an agreement? The only conspiracy here is between Freitas, the F.B.I. and the Government.

These inconsistencies were known to the F.B.I. and the United States Attorney, but they were contrary to the orchestrated pre-conceived ending. The F.B.I. and the United States Attorney perverted the meaning of the whole for the sake of editing details to fit the scene they wished to produce. Once it becomes apparent that Pannnone and I had not participated "in the same series" of transactions, it makes a mockery of Equal Protection and Due Process to hold the United States Attorney's allegation and proffer alone, now known to be false, as the bases of a conviction. None of the acts in question were "[b]ased on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

D

Simply stated, if one were a business man, who had done continued business with the city, always dealt with the city office and never before had monies demanded or expected for a public service, such as expected the payment of a 'paucity' amount of $1100.00, would a competent business person pay 30% of that amount just to get that check? Obviously the United States Attorney, the F.B.I. and the Court thought that an average reasonable business person would. That realization in and of itself explains alot. How else would they have arrived at such an absurd conclusion. Either that or Mr. Freitas is a "lousy" businessman and not as politically savvy as one would expect of a business doing business on a regular bases with the City.

IV.

In defiance of common sense, and a complete understanding of elementary school 'lunch-room' economics, is how can I be guilty of interfering with interstate commerce by extortion, when I, was not "the bully" of the 'lunch-room' and acquitted of extortion? I did nothing to diminish the business's economics, I in fact enhanced its financial postion. The F.B.I. and the United States Attorney flim-flammed the Rhode Island public.

Ineffective assistance of counsel, prosecutorial misconduct, purposeful media leaks and other countless instances of "mob" domination of my trial tarnished the American Legal System. A system whose decisions are supposed to be based on the Constitution, equal protection, and due-process, not trial by ambush. The most plausable inference one can draw is that politics was allowed to trump justice and fairness.

I file this for fear of a kind of historical entropy; in the measure in which law enforcement lost consciousness of a gap between what is and what ought to be, in their capacity to rise above themselves. The cost of their power is the pain of Constitutional hypocrisy. When the Government's quest for a conviction leads to the apprehension of an otherwise law-abiding citizen, who if left to his own devices likely would never have been afoul of the law, the Courts should intervene.

The gravamen of this claim is that the F.B.I., Law Enforcement assisted by the United States Attorney engaged in a loss of contact with the environment, deterioration in the level of functioning in reality, disintegration of individuality expressed as a disorder in reality thought. It would appear that law Officials, the F.B.I., and the United States Attorney engaged in an orchestrated, and scripted plot not unlike that of a schizophrenic.

ADDENDUM IV. Ground #4

**DENIAL OF CONSTITUTIONAL RIGHT OF DUE PROCESS**

The present is the past traveling under a pseudonym. The four Horseman of my Apocalypse; Pannone, Freitas, the F.B.I. and the United States Attorney Office, in the instant case, symbolize pestilence, perjury, teriversation and totalitarianism. Collectively they schemed to 'choke' my right to a fair trial, while 'sucking' out the life blood of "due process."

What occurred at my trial is exactly what the government's mission decries. Furthermore, given the political environment surrounding my trial, it defies the laws of nature and psychology to believe in the instant venue, that the United States Attorney's Office had any thoughts of "justice" or that an outbreak of catoptrics could immunize me against trespass of my Constitutional Rights. Not merely the outward gestures but the inner substance of fairness was deprived by the entire course of the government's procedure, impregnating the trial court with the mutated environing atmosphere.

**FAILURE TO SEPARATE**

Reasonableness of conduct was not viewed as of the time of that conduct. Arrested realism is the domain of the Four Horseman. For the charge was to remove and convict the popular "mayor". The potential for prejudice and confusion by not separating my trial from that of the "mayor" allowed for the assumption of facts not in evidence, improper vouching, suggesting Mr. Pannone is more credible than other witnesses. Conviction of the "mayor" was essential to proving the charge laid against me, which by definition is prejudicial.

**COUNT IV (continued)**

## LYNCH LAW

There is lyncher's virus in us all. In this case political ambition did not allow for dilution by other 'virus strains'. The trial functioned under the thrall of the media publicity, in which a vociferous media presence throughly cowed the jury, which should have been insulated from it. The denial that perceptions can be manipulated by expectations is contrary to the fundamentals of cognition and is an element to my claim of denial of the right of due process.

It is a simple fact that the proliferation of crime stories in the media news is dominated by information generated by the governmental institutions. In my case the government may not have purposely "handed" the "poisonous tape" to the media, but neither did they, as guardians of justice," do anything to prevent the injustice. Instead the "prince of justice," gouged themselves on the fruit of the poisonous tree. Feasting on its fruit twice per day at least eight months, content to be bloated before my trial. There was never any effort to protect my rights, the "system" was content in their media drunkenness. Preferring to wallow in the odoriferous decay of my right to "fairness" and "due process," rather than exhibit self-control. It would seem that the ideology, "[E]verything in the State, Nothing outside the State, Nothing against the State," is close to the heart of the United States Attorney's Office, the media in general, Channel 10 and its parent company NBC. Channel 10 the individual producer that received the tape, (to enhance his career), Channel 10 Attorney's, executives, assigns, ect., no one was sanctioned for the continuous airing of the "poision tape".

**COUNT IV (continued)**

I was summarily denied the opportunity to challenge the validity of the tape. I simply ask how the spirit of the law could have thrived when a major-domo was unwilling to sanction the offenders, or to protect my right of due process, instead allowing sensationalist coverage in violation of its very own Court Order? The Court's authority was disregarded, trampled, and worse of all seemingly manipulated as a political strumpet. The sole beneficiary of this behavior was not the People, but the government's ego. For it allowed the occupation of the cognitive psychic territory of any number of captive listeners. Biased, prejudicial evidence was allowed to pollute the domain and no one, not the factfinder, the "Princess-of-Justice, the expoent, all ignored my "hue & cry," allowing trial by opinion not fact.

The end result of a glutinous media feast, political chicanery, professional ambition, and gouging by the United States Attorney's Office is a flatulent malodorous cloud infecting the jury pool, obfuscating any notion of a fair trial dooming my right of due process to purgatory.

# MEMORANDUM

TO: Ms. Gertrude Blakey, Chairperson Providence School Board
FROM: Mark Dunham, Senior Director -- Administration Finance/Operations
DATE: July 16, 1998

SUBJECT: Warehouse Space Rental

Attached and below are some facts and information regarding the process of leasing warehouse space by the Providence School Department during the 1997-98 School year.

The attached February 2, 1998 letter from me to the Board of Contract and Supply chronicles the events from June of 1997 through February of 1998.

~~The memo from me to Susan DeRita dated February 11, 1998, also attached,~~ expresses my concerns regarding the JKL facility as a warehouse.

Since that time the department has re-advertised for space; received five (5) bids ranging from $2.50 per sq. ft. to $5.50 per sq. ft, (Mr. Anthony Freitas bid $4.90 per sq. ft.)

The bid was awarded to the low bidder, Harold Homonoff, on April 13, 1998.

Soon thereafter, Harold's Furniture filed for bankruptcy protection; the lease is valid, the space is available and therefore both sides are honoring the agreement.

Improvements have been done by the Providence School Department which are being deducted from the monthly rental through term of the lease($317.63 per month).

The department was unaware of Harold's Furniture debt to the City. However, you are aware all City purchasing procedures were adhered to, and all members of the Board of Contract and Supply were aware of the Department's choice, not only via the meeting but also through the extended coverage the issue received in the media.

Thanks you and the School Board for your support in this matter.

MVD/lmm
Attachments
CC: Arthur M. Zarrella

GBlkywarehouse,

VINCENT A. CIANCI, JR.
*Mayor*

ARTHUR M. ZARRELLA, PED. D.
*Superintendent*

JOSEPH ROTELLA, ESQ.
*School Board Attorney*

Providence Schools
OUR SCHOOLS. OUR FUTURE.

LEGAL COUNSEL

([redacted])

January 23, 1998

Mr. Anthony Freitas
JKL Engineering Co., Inc.
945 Westminster Street
Providence, Rhode Island
02903

Dear Mr. Freitas:

In response to your letter of January 15, 1998 to Mark Dunham, please be advised the Providence School Board is not in a position to negotiate a lease with you at this time. Further action must be taken on the part of the School Board and the Board of Contract and Supply in approving all bids that are received for the rental of property.

As you have been told by Dr. Zarrella and Mark Dunham, there are several options available to the School Board and until the proposed City Bond Issue is settled, the relocation of the warehouse and registration center is uncertain.

We appreciate your interest in providing space to the Providence School Department and will do our best to keep you apprised on developing matters.

Due to the above, the Providence School Department cannot make the commitments you are requesting.

Very truly yours,

Joseph A. Rotella (signature)

Joseph A. Rotella
School Board Attorney

JAR:rpi

EXHIBIT II Pg. 34

February 2, 1998

Honorable Mayor Vincent Cianci, Chairman
Board of Contract & Supply
City Hall
Providence, RI 02903

Dear Chairman:

The Providence School Department was prepared to request the Board of Contract & Supply approve a three year extension with JERE Realty for warehouse, office and registration space June of 1997. The request was denied and converted to a three month extension through September of 1997 for re-evaluating the District's needs.

In September the Department simultaneously requested the Board solicit bids for space and approve a second three month extension through December 1997.

On November 24, 1997, two bids were received and opened by the Board for the space. There were subsequently forwarded to the Providence School Department on December 1, 1997.

The bids were from the current landlord and JKL Engineering. The JKL properties are located on Westminster Street approximately two blocks from the Administration Building and the current facility. JKL's BID is $110,865., which is $90,262. less than the current landlord and other bidder JERE Realty.

There are concerns with the JERE Property regarding the price and the recent federal investigation of the selection process of the facility.

The space bid by JKL is currently under construction and incomplete at this time, however, the owner believes the space that could be used for the warehouse will be available February 1, 1998, and the registration center March 1, 1998.

The space has been reviewed by the Providence School Department staff, and although the estimate for the warehouse space seems reasonable, the estimated completion date for the registration center appears very optimistic.

There is no future for the Registration Center at the current location. The District plans to move the facility, hopefully adjacent to the proposed elementary school. The approval for the Bond issues has not yet been received, and it is therefore unclear if and when the center could be moved to that location.

When the center is moved, it should only move once, moving the operation twice in a year would prove to be costly, create inefficiencies within the process, and cause confusion within the community.

If the JKL space is to be considered as the permanent location for the Center, there are concerns for parking and the size and layout of the facility that must be addressed. I do not recommend rushing to move the Center if the fit isn't proper. (This does not mean the JKL property should be ruled out.) I suggest the facility moved once to a permanent location.

I suggest a visit to the JKL site for a final determination for that location regarding the logistics of the Registration matter.

Financially, the proposed lease is two years, with monthly savings of approximately $7,500, or $90,000. per year. The cost to move will be approximately $25,000., leaving a saving of $65,000. In year two, if the location is rent free at a Providence School Department Building, the cost will be $110,865. for a two year cumulative loss of $45.865; assuming there is no move out of the JKL Facility.

Further complicating the matter is the amount of time to move the facility. Kindergarten Registrations are publicized and heavy in April, and the center runs very consistently through November. The best time for the move would be December, January and February. This time frame is quickly passing, causing me to ask the Board for an extension of time for the JERE Realty lease. I am prepared to ask for a one year extension that will enable the Department to move when conditions are favorable.

Sincerely,

Mark V. Dunham, Senior Director
Administration Finance/Operations

MVD/lmm
CC: Dr. Arthur M. Zarrella
Mr. Joseph Rotella, Esquire
Mrs. Susan DeRita
Ms. Aisha Abdullah-Odiase

EXHIBIT II(A) CONT.

# MEMORANDUM

School Board Chairwoman

TO: Ms. Susan DeRita
FROM: Mark V. Dunham MD
DATE: February 11, 1998

SUBJECT: Registration Center

Attached please find a letter that I prepared to send to the Board of Contract and Supply two weeks ago which I think answers some of your questions. Also attached is a new proposal from JERE Realty which we cannot entertain without permission from the Board of Contract & Supply, and the School Board.

Some additional information; Registration Center 2600 sq. ft., nurse area 555 sq. ft., testing area 600 sq. ft. Registration Office space 4560 sq. ft., the warehouse is 6400 sq. ft.

Regarding the JKL Facility, there is no loading ramp, and I don't think there is enough of a turning radius to allow large trucks to make deliveries. The building must be handicapped accessible and properly insured before a lease will be executed.

Regarding the bidder's statement "willing to do more" it is very vague and changes regularly, it basically means putting up plasterboard.

Hopefully any additional information you need we can get on our visit Thursday.

/lmm
Attachments

EXHIBIT II(B)

# MEMORANDUM

TO: Dr. Arthur M. Zarrella, Superintendent
FROM: Mark Dunham, Senior Director -- Administration Finance/Operations
DATE: March 23, 1998

SUBJECT: Warehouse Space/Student Registration Center

On March 16, 1998, five bids were received by the Board of Contract and Supply regarding the **leasing of warehouse space** for the remainder of the fiscal year and several subsequent years.

Attached please find a list of the bidders, locations and their square foot bid price.

It is my plan to have a small group visit each facility beginning with the two lowest sq. foot prices. If either meet the District's needs there will be no need to proceed and the bid will be awarded. If the lower bidders do not meet the District's needs more buildings will be reviewed based on the bid with the greatest being last.

The group would consist of the Providence School Department warehouse personnel, Marriott Food Service, Marriott Facilities, Roland Rainville, and Everett Brooks from the Providence School Department, if any School Board members would like to be included (could please inquire at the March 23rd meeting), and myself.

I plan to award the lease at the regularly scheduled Board of Contract Supply meeting on April 13, 1998. This would give the Department time to review the areas and seek School Board Authorization to award.

The goal is to have the warehouse relocated by the preferred April 30th date. The final results will depend on the condition of the space that has been bid.

I spoke with Merlin DeConti, Vice President of Facility Management at Johnson and Wales University late last week. The University closed on the building considered for the **Student Registration Center** Thursday, March 19. He did not yet have keys to the building. I plan to visit the site with Registration Center Personnel, Vocational School Personnel, and Marriott Staff to determine what renovations would be required to best suit the departments needs, and the best way to have the work done.

The building currently has no water service. There are repairs to be done before the service can be restored which are to be paid by the Department. There is also cabling that must be done by Bell Atlantic to connect the site to the administration building which could take time to coordinate and schedule.

The goal is to vacate the current location by April 30, but some factors beyond our control may negatively impact the process.

I will keep you continually updated on the progress of these moves.

Thanks for your support.

MVD/lm
Attachment

warehs.pce

VINCENT A. CIANCI, JR.
*Mayor*

ARTHUR M. ZARRELLA, PED. D.
*Superintendent*

MARK V. DUNHAM
*Senior Director*
*Administration, Finance & Operations*

ROLAND L. RAINVILLE. C.P.M.
*Purchasing Administrator*

Providence Schools
OUR SCHOOLS. OUR FUTURE

PURCHASING

April 5, 1997

The Honorable Vincent A. Cianci, Jr.
Chairman, Board of Contract and Supply
City Hall
Providence RI 02903

Dear Mayor Cianci:

| | |
|---|---|
| **RE:** | LEASE OF 26,000 TO 30,000 SQ FT OF WAREHOUSE SPACE |
| **BID OPENING:** | March 30, 1998 |
| **RECOMMENDED:** | Harold and Phyllis Homonoff<br>2 Regency Plaza #301 Prov RI 02903 |
| **AMOUNT:** | NOT TO EXCEED $162,500.00 |

In response to our request for proposal regarding the above-entitled, our Department received the following bids:

| | NAME (Low bidder first) | Year 1 | Year 2 | |
|---|---|---|---|---|
| 1 | Harold and Phyllis Homonoff | 2.50/sq ft | 2.50/sq ft | not to exceed $162.500 |
| 2 | Quality Stampings | 2.60 | 2.80 | |
| 3 | Olympus Group Real Estate | 3.52 | 3.68 | |
| 4 | Anthony and Nancy Freitas | 3.60 | 3.60 | |
| 5 | Winter St Trust | 5.50 | 5.50 | |

_x_ On the basis of said bids, we recommend the low bidder on Line 1, meeting specifications

__ On the basis of said bids, we recommend bidder identified on Line 2. While not apparent low bidder, review of bids reveals that it is in the best interest of the City to reject the low bidder

Respectfully submitted,

Roland L. Rainville, C.P.M.
Purchasing Administrator

Account Code: 201-5-00010-1660 General

Amount: Not to Exceed $162,500.00

Finance Approval ______

AWARD: 2 mos. (May/June 98) $12,500.00
FY 98/99 75,000.00
FY 99/00 75,000.00
$162,500.00

RLR/spg
Enclosure
copy - Ms Gertrude Blakey, School Board Chair
– Ms Aisha Abdullah-Odiase, Vice Chair

797 Westminster Street • Providence • Rhode Island • 02903-4045 • (401) 456-9287 • FAX (401) 456-9292

The Providence School Department does not discriminate on the basis of age, sex, religion, national origin, color or disability in accordance with applicable laws and regulations.
MISSION: Students of all ages in the diverse cultural mosaic of the Providence community will be enthusiastic, life-long learners, workers, and citizens, each with marketable skills achieved relative to his or her ability. These outcomes will manifest themselves in a nurturing environment driven by excellence in educational opportunity.

EXHIBIT II (D)

# MEMORANDUM

TO: Dr. Arthur M. Zarrella, Superintendent
FROM: Mark Dunham, Senior Director – Administration Finance/Operations
DATE: March 23, 1998

SUBJECT: Warehouse Space/Student Registration Center

On March 16, 1998, five bids were received by the Board of Contract and Supply regarding the **leasing of warehouse space** for the remainder of the fiscal year and several subsequent years.

Attached please find a list of the bidders, locations and their square foot bid price.

It is my plan to have a small group visit each facility beginning with the two lowest sq. foot prices. If either meet the District's needs there will be no need to proceed and the bid will be awarded. If the lower bidders do not meet the District's needs more buildings will be reviewed based on the bid with the greatest being last.

The group would consist of the Providence School Department warehouse personnel, Marriott Food Service, Marriott Facilities, Roland Rainville, and Everett Brooks from the Providence School Department, if any School Board members would like to be included (could please inquire at the March 23rd meeting), and myself.

I plan to award the lease at the regularly scheduled Board of Contract Supply meeting on April 13, 1998. This would give the Department time to review the areas and seek School Board Authorization to award.

The goal is to have the warehouse relocated by the preferred April 30th date. The final results will depend on the condition of the space that has been bid.

I spoke with Merlin DeConti, Vice President of Facility Management at Johnson and Wales University late last week. The University closed on the building considered for the **Student Registration Center** Thursday, March 19. He did not yet have keys to the building. I plan to visit the site with Registration Center Personnel, Vocational School Personnel, and Marriott Staff to determine what renovations would be required to best suit the departments needs, and the best way to have the work done.

Building in Cranston, R.I.

The building currently has no water service. There are repairs to be done before the service can be restored which are to be paid by the Department. There is also cabling that must be done by Bell Atlantic to connect the site to the administration building which could take time to coordinate and schedule.

The goal is to vacate the current location by April 30, but some factors beyond our control may negatively impact the process.

I will keep you continually updated on the progress of these moves.

Thanks for your support.

MVD/lm
Attachment

warehs.pce

City of Providence

Rhode Island

# Department of City Clerk

## MEMORANDUM

DATE: March 16, 1998

TO: ~~Acting Purchasing Director~~

SUBJECT: LEASE OF 26,000 TO 30,000 SQ. FT. OF WAREHOUSE SPACE - SCHOOL DEPARTMENT.

CONSIDERED BY: Board of Contract and Supply

---

DISPOSITION: VOTED: that all bids be referred to the Acting Purchasing Director for tabulation.

Bids from:

| | | Yr 1 | Yr 2 | Yr 3 | Option Years Yr 4 | Yr 5 | Yr 6 | |
|---|---|---|---|---|---|---|---|---|
| 1205 Westminster St | Quality Stampings, Inc. | 3- | 3.25 | 3.50 | 3.75 | 4- | 4.25 | |
| ~~1 Reservoir Ave~~ | Olympus Group Real Estate | 3.35 | 3.57 | 3.64 | 3.85 | 4.[illegible] | 4.[illegible] | |
| ~~945 Westminster St~~ | Anthony and Nancy Freitas | 4.90 | 4.90 | 4.90 | 5.18 | 5.18 | 5.18 | ✓ |
| 819 Westminster St | Winter Street Trust | 5.50 | 5.50 | 5.50 | 5.50 | 5.50 | 5.50 | |
| 304 Pearl St | Harol and Phyllis Homonoff | 2.50 | 2.50 | 2.50 | 2.75 | 2.75 | 2.75 | |

Bids to Department 3/18/98

cc: Pur.Dir.
File

(3)

Michael R. Clement
City Clerk

JOSEPH M. FERNANDEZ
City Solicitor

DAVID N. CICILLINE
Mayor

# Department of Law

18 January 2006

Frank E. Corrente
Federal Medical Center Devens
P.O. Box 8789
Ayer, MA 01432

Re: Records Request

Dear Mr. Corrente:

We have reviewed the minutes between January 1997 and June 1999 to identify any minutes memorializing a meeting at which (1) Mr. Anthony Frietas attended and argued on his behalf to have the School Department lease his property; and (2) the School Board discussed and decided to accept the free use of a Johnson and Wales University building in Cranston for the storage facility to be occupied by Sodexho Marriott Corporation. The only minutes arguably falling within the category described are those enclosed, of the meeting of 24 August 1998.

The research time expended on this effort was three hours. There is no charge for the first hour. Would you kindly remit a check for $30.00 to the Providence School Department at your earliest convenience? You can make the check payable to the order of the Department, and send it directly to Maureen Cotter, Special Assistant to the Superintendent and School Board, Providence School Department, 797 Westminster St., Providence, Rhode Island 02903

Please advise if I can be of further assistance.

Very truly yours,

Sara A. Rapport
Legal Counsel, PSD

Enclosure

cc: Maureen Cotter, Providence School Department

275 Westminster Street, Suite 200 • Providence, Rhode Island 02903-1845
(401) 421-7740 (Voice) • (401) 751-0203 (TDD) • (401) 351-7596 (Facsimile)

EXHIBIT III

## DECLARATION OF PHILIP D. PESTRICHELLO

I, Philip D. Pestrichello, do hereby declare, under the pains and penalty of perjury, that on Wednesday September 29, 2004 I had a detailed face-to-face conversation with Joseph Pannone regarding his criminal case and Frank E. Corrente:

1. I asked Mr. Pannone..."So Joe, how does it feel to finally be going home after all of these years?"

   Mr. Pannone responded..."It's bittersweet. I'm happy it's over for me, but I feel bad for Corrente."

2. I asked Mr. Pannone..."Why do you feel bad for Frank?"

   Mr. Pannone responded..."Because Frank should be home already and he still has 2 years to go."

3. I asked Mr. Pannone..."Joe, not-for-nothing, but how come you feel bad for Frank when it was your tapes that got Frank into trouble?"

   Mr. Pannone responded..."Those tapes are bullshit! I never did anything with Frank! I sure as hell never conspired with Frank! The only thing Frank did wrong was take that envelope of money, that's it!"

4. I asked Mr. Pannone..."Joe, why the Hell did you say all of that shit on those tapes?"

   Mr. Pannone responded..."Jesus, those tapes are bullshit! I told my no-good money-whore lawyer to tell the prosecutor that the tapes were bullshit! But the Goddamned prosecutor wanted to get Corrente and Cianci and told me that if I tried to argue about the tapes or if I took the stand to testify that I wouldn't get immunity or home-confinement, and he would add Perjury charges to give me 10 fucking years! 10 fucking years Phil, I was scared! I'm an old man, I didn't want to piss those no-good bums off!"

5. I asked Mr. Pannone..."Joe, if you knew those tapes were bullshit, why didn't you just tell the truth?"

   Mr. Pannone responded..."Because they promised to give me home-confinement! But they told me that if I testified they would hit me with Perjury and try to give me 10 years! Those bums, they fucked me anyway and gave me 5-years, even though I never took the stand! They're fucking bums! They wanted the Mayor and they couldn't get Corrente to give up the Mayor, so Frank got fucked! I even told Freitas to go meet with Frank, take him out to lunch, try to get to Frank. I was scared, I didn't want to get 10-years!"

I, Philip D. Pestrichello, do hereby state under the pains and penalty of perjury, that the above referenced conversation is true and correct.

Signed this 12 th day of October, 2004.

Philip D. Pestrichello

Witness

EXHIBIT V

**STATEMENT OF VINCENT DIGUILIO**
**AUGUST 13, 2004**

The following statement is an account of information that I passed on to Mr. Frank Corrente resulting from a series of conversations, over a period of months, that I have had with Mr. Joseph Pannone. Mr. Corrente has asked me to repeat what I said to him in a written statement for purposes of preserving my thoughts and conversations with Pannone. I submit the following:

Firstly, in order to provide some background perspective, I self-surrendered at Devens, FMC June 9, 2003, and was assigned to the dining room staff 3-weeks later. Mr. Pannone had also been assigned to the dining room. Despite the fact that I did not know personally Mr. Pannone or Mr. Corrente prior to my incarceration we became friendly, sharing a commonality in that we were all senior citizens, Rhode Island natives, working and living together at the camp and bonding together in the shared experience of incarceration. OVer the course of the last 14-months I have had daily conversation and discussion with Mr. Pannone, with whom I work, and Mr. Corrente and Mr. Autiello both of whom I play cards with, watch T.V. and discuss books, sports, and other issues on a regular basis. On many ocassions the conversation has drifted to the "Plunder Dome" affair which involved, former Mayor Cianci, Mr. Pannone, Mr. Corrente, and Mr. Autiello. I having read the "Prince of Providence" and being someone who had followed the case from inception, as it unfolded through trial and consequence, and through the sensationalism and notoriety afforded it by the local media, became naturally inquisitive and curious to hear their candid side of the story. I have gleaned insights from all parties remarks, and here share remarks, particular to Mr. Pannone, that are relative and pertinent to Mr. Corrente.

About 8-months ago Mr Pannone said in revelation and I paraphrase, "I never gave a dime to Frank or the Mayor." "So what did you do with the money?" I inquired. "I kept it, spent it, It wasn't much, a few thousand dollars." This remark, in substance, was reiterated to me several months later. On August 12, 20004 in order to tighten the specific and reinforce in my mind his previous comments and iterations, I had a conversation with Mr. Pannone which included the following near verbatim remarks! "I told Frank (Corrente) It's on the tapes, all he has to do is look at them. I never gave him or the Mayor anything not a dime." In the course of the conversation I asked him why he never testified and he replied " I would have loved to testify. I wanted to." Well why didn't you? " My lawyer wa working in cahoots with them (the prosecutors) and he wanted me to plead guilty and take the fifth." "Well if you had already pled guilty what did you have to lose by testifying?" "You could have at least gotten your story out." "They didn't want me to testify (they are identified as his lawyer and the prosecutors). "They didn't want me to tell the truth", he said. This is a truthful rendering of what I heard from Mr. Pannone.

[signature]

EXHIBIT V

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA
Plaintiff

V.

VINCENT CIANCI et. al.
Defendants

DECLARATION OF DAVID G. STERN

I, David G. Stern, hereby under oath declare as follows;

1. I am of lawful age and reside in Newport, RI.

2. From January 8, 2003 to October 13, 2004 I was an inmate at the Federal Medical Center-Devens at the Camp.

3. The Camp housing facility was an open dorm design with two (2) person sleeping areas separated by six foot high fabric partitions.

4. My sleeping area was approximately twelve (12) feet away from that of Joseph Pannone and eight (8) feet from that of Frank Corrente.

5. I also worked each day with Mr. Pannone.

6. I am familiar with the basic facts in the above captioned matter and have read all the Appellate briefs. I have also read the book entitled "Prince of Providence" by Michael Stanton.

7. I spoke with Mr. Pannone every day. Our conversations varied in length from a casual greeting to over ten minutes. My conversations with Mr. Corrente were also daily, but somewhat longer than those with Mr. Pannone.

8. Subsequent to the release of "The Prince of Providence", Mr. Pannone on several occasions, while commenting upon the factual correctness of Mr. Stanton's book, said "I don't ever recall talking to Frank [Corrente] on the phone."

9. Mr. Pannone on more than one (1) occasion also commented that he "never did business with Corrente" and only recalls meeting him on several occasions at "funding raising things for the Mayor".

10. Responding to the question "so you and Frank [Corrente] didn't work together?", Mr. Pannone responded "f**k no. It's all b**l s**t...f**king b**l s**t."

signed under the pains and penalties of perjury this ________ day of October, 2004.

David G. Stern

Your honor,

Mr. Stern is an Attorney and a graduate of Harvard University School of Law. Mr. Stern is a resident of Newport, Rhode Island.

Sincerely,

Frank E. Corrente

News

MARCH 1, 2006 — CRIMINAL LAW REPORTER
(VOL. 78, NO.21)

*Prosecutors*

## APRL Panelists Examine Why Prosecutors Are Largely Ignored by Disciplinary Officials

CHICAGO—When a court presiding over a criminal matter finds that prosecutorial misconduct has occurred, many assume that the disciplinary system will "kick in" to hold the prosecutor accountable for any associated ethics violations.

But often this is not the case, according to some of those who spoke at an American Bar Association program on "Prosecution Ethics: Do Prosecutors Seek Justice or Merely Convictions?" Rather, these speakers argued, prosecutors whose misconduct has tainted a criminal proceeding typically suffer few if any disciplinary consequences.

The Feb. 10 session was sponsored by the Association of Professional Responsibility Lawyers in conjunction with the ABA's Midyear Meeting.

**Special Duties of Prosecutors.** Criminal prosecutors have long been deemed to operate under enhanced ethical duties. As stated in *Berger v. United States*, 295 U.S. 78, 88 (1935), a prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."

Recognizing this unique function, the ABA Model Rules of Professional Conduct include a special standard, Model Rule 3.8, that applies only to prosecutors in criminal cases.

The Comment to Rule 3.8 observes that "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."

Calling attention to "an alarming number of convictions of innocent people at the hands of prosecutors who focus on their duties as advocate, to the apparent exclusion of their responsibility to administer justice," moderator James M. McCauley, ethics counsel for the Virginia State Bar, asserted that "it is rare for prosecutors to face disciplinary charges even for clear violations of Rules 3.3 or 3.8." (Model Rule 3.3 requires lawyers' candor toward tribunals.)

According to panelist and law professor Ellen Yaroshefsky, executive director of Cardozo Law School's Jacob Burns Ethics Center in New York, some 180 convicts have been exonerated based on DNA testing.

"Forty-three percent of the cases of exoneration involve allegations of prosecutorial misconduct," Yaroshefsky said; "not just errors in judgment, but intentional misconduct involving the suppression of evidence or the presentation of false evidence. There is no question that there is a significant problem."

"Most prosecutors think this is an aberration," she said. But it is the almost total lack of accountability for prosecutors' ethical lapses in these cases that concerns her. Yaroshefsky cited a study by the Center for Public Integrity analyzing cases of prosecutorial misconduct in each state since 1970. "In New York," she recounted, "of 1,283 allegations of prosecutorial misconduct, 277 resulted in a ruling that the conduct prejudiced the defendant and the conviction was reversed, yet none of these prosecutors was disciplined."

"The data out there suggests there is a significant problem," Yaroshefsky told the audience.

**It's Not So Bad.** Panelist Amie L. Clifford, director of the Center for Prosecution Ethics at the National College of District Attorneys in Columbia, S.C., said she doesn't believe that there is a systemic problem. Although remarking that historically "prosecutors have not been disciplined as much as possible," Clifford said she believes the situation is changing.

In the past 10 years, Clifford said, prosecutors have received more ethics training and are following the rules. "Yes," she commented, "some prosecutors will ignore the ethics rules, but most prosecutors don't want to do anything to jeopardize a conviction."

> **"There's an expectation that the judiciary will take care of unethical prosecutors. But the judiciary doesn't."**
>
> ELLEN YAROSHEFSKY
> CARDOZO LAW SCHOOL

Clifford also emphasized the difference between the way the phrase "prosecutorial misconduct" is used in criminal caselaw and the way it is used in disciplinary cases. "If a prosecutor commits any type of error, an appeals court will refer to it as prosecutorial misconduct," she said. However, she added, this is not the same thing as "prosecutorial misconduct" in the disciplinary setting, which refers to a violation of the ethics rules.

**Who's Responsible?** If it is true that prosecutors are unlikely to be taken to task in the disciplinary system even for the most egregious violations, why is this? "Is the system conducive to reporting?" asked McCauley. "Is there an under-reporting problem?"

"Historically, the disciplinary system hasn't addressed this," Yaroshefsky said. "Disciplinary counsel generally have no experience in criminal law," she added. State disciplinary systems have limited resources and generally are "geared toward protecting the public from small practitioners who steal money